IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CABO UNITED LLC, | § | |
| | § | |
|    *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | |
| MEENA R. PATEL, VIJAY BHASKAR ATTI, ISHAAN AGGARWAL, KOTESWAR RAO GAJAVELLI, AND SHEFALI AGGARWAL | § § § § § | CIVIL ACTION NO. _____ |
| | § | |
|    *Defendants.* | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff Cabo United LLC ("**Lender**") files this Original Complaint and shows as follows:[1]

## I.   SUMMARY

1. Lender files this lawsuit to recover amounts that are due and owing on a commercial loan made by Original Lender, EMG Transfer Agent LLC ("**Original Lender**"), to Cabo Houston Borrower DE LLC ("**Borrower**") with an original principal balance of $65,200,000. Repayment of the loan is secured by, among other things, a multi-family apartment complex commonly known as the Cabo San Lucas Apartments, which is located at 9220 Nathaniel Street, Houston, Texas 77075 (the "**Property**"); and (ii) personal guaranty liability of the five named Defendants in this lawsuit (collectively, "**Guarantors**") for recourse violations identified in the Guaranty of Recourse Carve-Outs (the "**Guaranty**").

2. This lawsuit arises out of multiple recourse violations that are detailed below, all of

---

[1] Capitalized terms not immediately defined are defined below.

which have caused tremendous damage to Lender and to the Property. When the loan was originated, Original Lender held back $6.5 million for Property improvements, which Original Lender would fund following Borrower's providing required paperwork, including permits, plan specifications, lien waivers, and invoices, as set forth in the Loan Holdback and Disbursement Agreement (the "**Holdback Agreement**"). (*See* **Ex. 1**.) Original Lender disbursed $500,000 immediately and later paid the remaining $6 million to fund improvements and operating expense that Borrower could not cover with Property funds, such as utilities, insurance, security and management fees. Nevertheless, Borrower ran the Property into the ground.

3. In August 2022, the City of Houston served Borrower with a Notice of Violations detailing at least 116 separate habitability violations, including dozens of structural and electrical problems. (*See* **Ex. 2**.) Two months later, the City's inspector confirmed that Borrower failed to fix most of the violations. (*See* **Ex. 3**.) Residents reported increasing incidents of violent crime, theft, and property damage. (*See* **Ex. 4**.) A local news station and politician publicly rebuked Borrower for the dire state of affairs at the Property, with news reports chronicling "[p]ower outages, no water, mold and pests are just a few complaints from residents at Cabo San Lucas apartment complex in SE Houston." (*See* **Ex. 5**.) By the Fall of 2022, occupancy at the Property plummeted from over 94% to 54%.

4. Borrower squandered funds disbursed by Original Lender for improvements and operating expenses. By February 2023, it was apparent that Borrower was incapable of turning things around. In an attempt to salvage the Property, Original Lender sought appointment of a receiver in Texas State Court to take possession and control of the Property (the "**Receivership Lawsuit**"). (*See* **Ex. 6**.)[2] Inexplicably, Borrower aggressively opposed the receiver and caused

---

[2] The Receivership Lawsuit is captioned *EMG Transfer Agent LLC v. Cabo Houston Borrower DE LLC*, Cause No. 2023-04208, in the 157th Judicial District Court of Harris County, Texas.

even more expense and delay, while the Property continued to deteriorate.

5. Original Lender then shifted gears and decided to foreclose. But a contractor hired by Borrower, Evan Stamenov d/b/a Westward Holdings, Inc. ("**Westward**"), obtained a TRO to stop the sale. (*See* **Ex. 7**.) Westward produced invoices and testimony from Borrower's property manager that Borrower and its property manager allowed Westward to supply materials to the Property before the loan was originated. (*See* **Ex. 8**.) Thus, Westward had evidence supporting its contention that its lien primed Lender's lien. Borrower failed to resolve Westward's claim even though it threatened to jeopardize Lender's lien. Consequently, Lender was forced to pay $700,000 to Westward in order to resolve Westward's claim so that Lender could foreclose on the Property and otherwise exercise Lender's rights regarding its secured collateral. (*See* **Ex. 9**.)

6. Borrower's egregious mismanagement and wrongful conduct subjects Guarantors to immediate personal liability under the Guaranty. Guarantors are personally liable for all damages caused by Borrower's waste, fraud, habitability and other code violations, willful breach of warranties, failure to fund taxes and insurance, failure to timely fund Property improvements, allowing liens to be recorded against the Property, and misappropriation of funds provided by Original Lender for Property improvements.

7. In addition, Borrower committed fraud by making material misrepresentations in connection with the loan origination, and/or failing to disclose material facts during origination, regarding Westward's activity at the Property prior to origination of the loan. Original Lender would not have made the loan if any lien could be found to be superior to Lender's lien.

8. Furthermore, Borrower's insolvency violates the Single Purpose Covenants contained in the Deed of Trust, which subjects Guarantors to full recourse liability for the entire indebtedness.

## II.     JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because, as outlined below, complete diversity of citizenship exists between Lender, on the one hand, and Guarantors, on the other hand, and because the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

10. Guarantors are subject to personal jurisdiction in Texas because, among other reasons, the loan is secured by the Property, which is located in Texas, and four of the five Guarantors are Texas residents. Lender's claims arise out of Guarantors' contacts with the State of Texas, via Guarantors entering into the Guaranty and committing recourse violations via the actions and inactions of Borrower and its agents in Texas.

11. Venue of this action is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because all or a substantial part of the events or omissions giving rise to Lender's claim occurred in this District.

## III.     PARTIES

12. Lender is a Delaware limited liability company. Lender's sole member is Sheridan Capital, LLC ("**Sheridan**").

   a. Sheridan has two members: Sheridan FM Holdco, LLC and EF Holdco RER Assets, LLC.

      i. Sheridan FM Holdco, LLC has two members: Kurlansky Holdings, LLC and Breco Equities, LLC.

         - Kurlansky Holdings, LLC has one member: Aaron Kurlansky, who is a resident of Florida.

         - Breco Equities, LLC has one member: David Brecher, who is a resident of Florida.

      ii. EF Holdco RER Assets, LLC's sole member is EF Mortgage LLC.

- EF Mortgage LLC's sole member is Ellington Financial Inc., which is a Delaware company whose principal place of business is located at 53 Forest Avenue, Old Greenwich, Connecticut 06870.

b.  Consequently, Lender is a citizen of Florida, Delaware, and Connecticut for purposes of diversity jurisdiction. Lender may be served with any pleading in this lawsuit through its undersigned counsel of record.

13.  Defendant Meena R. Patel resides at 83 Beckwith Place, Rutherford, New Jersey 07070. She is therefore a citizen of New Jersey for purposes of diversity jurisdiction. She may be served at that address, or wherever she may be found. Alternatively, because Ms. Patel has not designated or maintained an agent for service of process in Texas, she is deemed to have appointed the Texas Secretary of State as her lawful agent for service of process in Texas, and may be lawfully served through the Texas Secretary of State. *See* Tex. Civ. Prac. & Rem. Code §§ 17.044–17.045.

14.  Defendant Vijay Bhaskar Atti resides at 2707 Barrons Cove Court, Pearland, Texas 77584. He is therefore a citizen of Texas for purposes of diversity jurisdiction. He may be served at that address, or wherever he may be found.

15.  Defendant Ishaan Aggarwal resides at 17302 Legend Creek Court, Tomball, Texas 77375. He is therefore a citizen of Texas for purposes of diversity jurisdiction. He may be served at that address, or wherever he may be found.

16.  Defendant Koteswar Rao Gajavelli resides at 1162 Pedernales Trail, Irving, Texas 75063. He is therefore a citizen of Texas for purposes of diversity jurisdiction. He may be served at that address, or wherever he may be found.

17. Defendant Shefali Aggarwal resides at 4313 Verone Street, Bellaire, Texas 77401. She is therefore a citizen of Texas for purposes of diversity jurisdiction. She may be served at that address, or wherever she may be found.

18. Guarantors are therefore citizens of New Jersey and Texas for purposes of diversity jurisdiction. Because Lender is a citizen of Florida, Delaware, and Connecticut, complete diversity of citizenship exists for this lawsuit.

## IV.  BACKGROUND FACTS

### A.  THE COMMERCIAL LOAN

19. On or about December 30, 2021, Borrower executed that certain Promissory Note (as amended and/or assigned, the "**Note**"), whereby Borrower took out a $65,200,000 commercial loan from Original Lender. (*See* **Ex. 10**.) The funds advanced pursuant to the Note were used in connection with, among other things, the Property, which includes all of the real property, personal property, and general intangibles described in the Deed of Trust.

20. Repayment of the Note is secured by, among other things, the liens, security interests, terms, and provisions contained within that certain Deed of Trust, Security Agreement and Fixture Filing (as amended and/or assigned, the "**Deed of Trust**"), dated December 30, 2021, executed and delivered by Borrower, as Grantor, to John D. Hammond as Trustee, for the benefit of Lender, as Beneficiary, recorded in the Real Property Records of Harris County, Texas as Instrument No. RP-2022-722 covering, among other things, the Property. (*See* **Ex. 11**.)

21. On or about December 30, 2021, Guarantors executed the Guaranty. In Section 2.01(a) of the Guaranty, Guarantors "unconditionally, absolutely and irrevocably" guaranteed "the complete and timely payment to Lender of all damages, costs and losses" associated with all Loss

Liability Events, which are part of the Guaranteed Obligations for which Guarantors are personally liable.  (*See* **Ex. 12**.)

22. In Section 2.01(b) of the Guaranty, Guarantors agreed that certain events constitute "Full Recourse Events" for which Guarantors are personally liable for the entire indebtedness.

23. The Note, the Deed of Trust, the Holdback Agreement, the Guaranty, and any and all other documents executed in connection therewith and/or relating in any way thereto are referred to hereinafter either individually, or collectively, as the "**Loan Documents**."

24. Through a series of assignments and transfers of the Loan Document, Lender is the owner and holder of the Loan Documents, and has the right to enforce the Loan Documents.  (*See* **Ex. 13**.)

B. **BORROWER FLAGRANTLY MISMANAGED THE PROPERTY**

25. On or about August 23, 2022, the City of Houston served Borrower with a Notice of Violations detailing at least 116 separate habitability violations, including:

- 65 structural and electrical violations whereby the City ordered Borrower to "[o]btain required permits and begin repairs immediately."

- 48 structural and electrical violations whereby the City ordered Borrower to "[r]epair unsafe structural, electrical, and plumbing."

- 3 violations whereby the City required Borrower to "[c]lean up sewage remnants and sanitize affected areas."

(*See* **Ex. 2** at 9-10.)

26. On October 17, 2022, the City issued another Notice of Violations, indicating that most of the violations remained unfixed.  (*See* **Ex. 3**.)  In the midst of these violations, Original Lender conducted an audit of the Property, including multiple site visits, over a six-month period.  (*See* **Ex. 14**.)  The audit found that the electrical repairs had already been "vandalized and removed," and that the much of the work proceeded with plan approvals only, not permits, and so

"work has since stalled." (*Id.* at p. 3.)  The Report further detailed substantial repairs that were needed in order to make approximately 450 units "rent ready." (*Id.*)  The audit includes dozens of photos depicting filth, broken windows, broken lights, exposed ceilings and floors, and similar unacceptable living conditions.  (*Id.* at p. 3.)

27. Over the next several months, Original Lender disbursed all $6 million in remaining holdback funds to pay for habitability repairs, security, and other urgent items.  This despite the fact that Borrower never produced the required paperwork, permits, releases, and other items under the Holdback Agreement.  Many of those funds were sent to Borrower, which has never been able to account for those funds or explain how (or whether) they were used to address the dozens of habitability issues and other urgent health-and-safety issues at the Property.  Original Lender sent Borrower default notices demanding that Borrower make required repairs and otherwise cure Borrower's numerous defaults.  (*See* **Ex. 15**.)  Borrower never did so.

C. **CLAIMS BY WESTWARD AND OTHER VENDORS**

28. Borrower's mismanagement of the Property resulted in a series of mechanic's liens and other liens filed by vendors for unpaid work.  (*See* **Ex. 16**.)  Original Lender worked closely with Borrower in an attempt to pay these expenses from holdback funds.  But Borrower consistently failed to produce the required documents and related materials in order to obtain disbursements under the Holdback and Disbursement Agreement.

29. Borrower engaged Westward as the original general contractor to perform Property repairs.  Borrower believed that Westward did shoddy work, and so Borrower replaced Westward without paying Westward in full.  On December 14, 2022, Westward filed an Affidavit Claiming Constitutional Lien (the "**Westward Lien**") against the Property in the original amount of $9991,640.  (*See* **Ex. 17**.)  Then, on January 26, 2023, Westward filed the lawsuit captioned *Evan*

*Stamenov d/b/a Westward Holdings, Inc. v. Cabo Houston Borrower DE, LLC, et al.*, Cause No. 2023-05162, in the 113th Judicial District Court of Harris County, Texas (the "**Lien Lawsuit**"). Then, on April 27, 2023, Westward intervened in the Receivership Lawsuit and filed a Notice of Lis Pendens against the Property. (*See* **Ex. 7**.)  Westward took the position in the Lien Lawsuit and the Receivership Lawsuit that the Westward Lien was superior to Lender's secured lien.  In particular, Westward claimed that Borrower and Borrower's property manager authorized Westward to purchase materials for the Property, and to deliver those materials to the Property, prior to the loan closing.

30. Meanwhile, nine other vendors filed mechanic's liens against the Property asserting claims exceeding $1 million.  (*See* **Ex. 16**.)  Nevertheless, Borrower still refused to agree to appointment of a receiver for the Property.  With the Property devolving further into disrepair, Original Lender posted the Property for the August 1, 2023 non-judicial foreclosure sale.

31. Westward sought a TRO to stop the sale.  In support of its TRO application, Westward produced the declaration of Kim M. Alexander, the former Regional Asset Manager of Applesway Investment Group, LLC ("**Applesway**").  (*See* **Ex. 8**.)  Applesway was Borrower's affiliated property manager from the origination of the loan through the Fall of 2022.  In her declaration, Alexander testified that Defendant Gajavelli, Borrower's principal, authorized Westward to purchase and deliver supplies to the Property prior to the loan's origination.  (*Id*.)  Westward's principal, Evan Stamenov, testified as to the same.  (*See* **Ex. 18**.)  Thus, Westward's contention that its lien primed Lender's secured lien was corroborated by testimony from Borrower's affiliated property manager.  Because Alexander was directly involved in day-to-day operations at the Property around the time the loan was originated, her testimony was devastating to Lender's secured position.

32. Westward's evidence and pleadings were all served on Borrower, which was a party to the Receivership Lawsuit. Lender's counsel told Borrower's counsel that Borrower's failure to resolve Westward's claim threatened to cause tremendous damage to Lender. Borrower provided a declaration from Gajavelli claiming that Borrower never authorized Westward to purchase or deliver materials to the Property prior to loan origination. But other than that, Borrower did nothing to resolve Westward's claim.

33. Based on evidence produced by Westward from Borrower's property manager, the State Court granted Westward's TRO. (*See* **Ex. 7**.) Lender's secured lien was now in jeopardy. Faced with the threat of losing its secured collateral or litigating with Westward for months (or years) while the Property continued to deteriorate, Original Lender paid Westward $700,000 to resolve its claim, so that the foreclosure sale could proceed on August 1. (*See* **Ex. 9**.) Prior to the foreclosure sale, the Loan Documents were transferred to Lender, and then Lender acquired the Property at the foreclosure sale via credit bid of $50 million. (*See* **Ex. 19**.)

D. **GUARANTORS' RECOURSE LIABILITY**

34. Borrower's wrongful conduct subjects Guarantors to immediate personal liability under the Guaranty.[3] The relevant recourse provisions are as follows:

> ➤ *Recourse Liability for Loss Liability Events:*

| | |
|---|---|
| Section 2.01(a)(1) | misappropriation, conversion, or intentional misapplication of loan proceeds. |
| Section 2.01(a)(2) | intentional or willful misrepresentations by Borrower or Guarantor in any of the Loan Documents. |
| Section 2.01(a)(3) | intentional or willful breach of warranties by Borrower or Guarantor in any of the Loan Documents. |

---

[3] The relevant actors under the Guaranty are the "Borrower Parties," which is defined to include "Borrower, or its partners, officers, directors or agents." That would include Borrower's property manager and anyone acting on Borrower's behalf.

| | |
|---|---|
| Section 2.01(a)(4) | intentional material waste of the Property |
| Section 2.01(a)(5) | any building code or other type of violation levied against the Property |
| Section 2.01(a)(6) | failure to pay charges for labor or materials or other charges that can create liens on the Property |
| Section 2.01(a)(7) | failure to pay taxes and insurance |
| Section 2.01(a)(9) | bad faith contesting Lender's remedies and rights under the Loan Documents |
| Section 2.01(a)(10) | failure to timely complete Property improvements[4] |

➢ **Full Recourse Events**

| | |
|---|---|
| Section 2.01(b)(i) | fraudulent acts or omissions of any of the Borrower Parties |
| Section 2.01(b)(vi) | failure to comply with Single Purpose Covenant in the Deed of Trust, Section 58(f) of the Deed of Trust, requiring Borrower to remain solvent |

35. In Section 2 of the Deed of Trust, Borrower represented and warranted to Lender as follows:

> 2. **Warranty of Title.** Grantor warrants that Grantor has good title to the Mortgaged Property and has the right to mortgage, give, grant, bargain, sell, alien, enfeoff, convey, confirm, pledge, assign and hypothecate the same and that Grantor possesses an unencumbered fee estate in the Premises and the Improvements and that it owns the Mortgaged Property free and clear of all liens, encumbrances and charges whatsoever except for those exceptions shown on Exhibit B ("Permitted Encumbrances"). Grantor shall forever warrant, defend and preserve such title and the validity and priority of the lien of this Deed of Trust and shall forever warrant and defend the same to Beneficiary against the claims of all persons whomsoever.

36. The Westward Lien is not a Permitted Encumbrance under the Deed of Trust, or under any of the Loan Documents. Borrower willfully and deliberately breached this and other warranties under the Loan Documents by allowing the Westward Lien and Lis Pendens.

---

[4] The deadlines for completing Property improvements are found in Schedule A to the Holdback Agreement. (*See* **Ex. 1**.)

37. In December 2021, when the loan was originated, Borrower and its agents, including Borrower's property manager, made material misrepresentations regarding the priority of Lender's secured lien, and the pledge that no interest or lien primed Lender's lien other than the Permitted Encumbrances specifically stated in the Deed of Trust. Borrower and its agents also failed to disclose material information regarding Westward and materials that Borrower and/or its property manager (according to Westward) allowed Westward to supply to the Property before the loan was originated. Original Lender would not have made the loan to Borrower had Original Lender known about Westward's pre-origination activity.

38. Original Lender was not in a position to discover Westward's pre-origination activity in the exercise of reasonable diligence. Original Lender had the Property inspected on November 23, 2021. The inspection did not show any work being performed at the Property, or any materials that had been supplied to the Property for any future work. Borrower had a duty to disclose that Borrower and/or its property manager had allowed Westward to supply materials to the Property (as Westward contends) between the inspection date and the date on which the loan was originated. Borrower did not do so, and instead represented that its secured interest was subject to only the Permitted Encumbrances.

39. In addition, Borrower's longstanding insolvency cannot be reasonably disputed: Borrower has not been able to pay basic Property expenses, including operating expenses, utilities, security, and contractor and subcontractors, as those expenses become due. Borrower's insolvency contributed to the Property's demise. And Borrower's insolvency makes Borrower's decision to aggressively oppose appointment of a receiver for the Property inexcusable.

## V. CAUSES OF ACTION AND REMEDIES

### A. BREACH OF CONTRACT

40. Lender incorporates by reference all of the paragraphs above and below to the extent they are consistent herewith.

41. Guarantors breached the Loan Documents by, among other things, failing to pay all amounts required under the Loan Documents based on: (i) misappropriation, conversion, misapplication of Property funds; (ii) intentional misrepresentations and/or failure to disclose material facts; (iii) intentional or willful breaches of warranties in the Loan Documents; (iv) intentional material waste of the Property; (v) building code and similar statutory violations; (vi) failure to pay charges for labor or materials resulting in mechanic's liens; (vii) failure to pay tax and insurance premiums; (viii) bad faith contesting Lender's rights under the Loan Documents to obtain appointment of a receiver; and (ix) fraudulently allowing the Westward Lien; and (x) failure to timely complete Property improvements. Guarantors' breaches have caused substantial damage to Lender, for which Lender brings this lawsuit to exercise its rights pursuant to law and/or equity.

### B. FRAUD

42. Lender incorporates by reference all of the paragraphs above and below to the extent they are consistent herewith.

43. As detailed above, Borrower committed fraud in connection with the Westward Lien and Westward Lis Pendens. Under the Guaranty, Borrower's fraud constitutes both a Loss Liability Event and Full Recourse Event. Borrower's fraud caused substantial damage to Lender and the Property, for which Lender brings this lawsuit to exercise its rights pursuant to law and/or equity.

### C.     ATTORNEYS' FEES

44. Lender incorporates by reference all of the paragraphs above and below to the extent they are consistent herewith.

45. Because of Guarantors' actions, Lender has found it necessary to engage the law firm of Holland & Knight LLP to prosecute this action and to protect its rights. Pursuant to Section 3.06 of the Guaranty and Section 38.001 of the Texas Civil Practice and Remedies Code, *et seq.*, Lender is entitled to recover its reasonable and necessary attorneys' fees incurred in the prosecution of this action.

## VI.     CONDITIONS PRECEDENT

46. Lender has satisfied all conditions precedent to bringing this action.

## VII.     PRAYER FOR RELIEF

47. Guarantors be cited to appear and answer herein; and on final trial hereof, Lender have judgment against Guarantors for Lender's actual damages and exemplary damages, as provided in the Loan Documents, and according to applicable law, and interest to the extent allowed by applicable law, together with its reasonable and necessary attorneys' fees and all costs of court, and such other and further relief, both general and special, at law or in equity, to which Lender may be justly entitled.

48. That the Court grant any other such, general, or different relief to which Lender may be entitled.

Respectfully submitted,

By: *Chris Chauvin*

    Christopher L. Chauvin
    Texas Bar No. 24045644
    S.D. Tex. Bar No. 917854
    chris.chauvin@hklaw.com
    Alexander T. Dimock
    Texas Bar No. 24094628
    S.D. Tex. Bar No. 3114132
    alex.dimock@hklaw.com

**HOLLAND & KNIGHT LLP**
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1662

**ATTORNEYS FOR PLAINTIFF**